Mr. Baldwin, whenever you are ready, you may proceed. Good afternoon, Your Honor. Counsel, you may please the court. I'm John Bowling on behalf of Ms. Sherri Conroy, who is in court today. She's left and behind the counsel's table. Your Honor, my client is not suggesting that there is any per se constitutional right to engage in prostitution or, as the state puts it, commercial sex. There is no such per se constitutional right, and any suggestion that there is or any suggestion that a constitutional issue presented for review could be framed that narrowly. It would be frivolous. What Ms. Conroy is asserting is that there exists a constitutional right for the citizens of this state, so long as they are adults and acting privately and consensually, to engage in sexual activity without fear of arrest. For payment. In some cases, that would be true, Your Honor. However, the right to engage in sexual relations for adults, and again, privately and consensually, is a broad one. And any statute that touches against that right, such as the subject statute here, 11-14a, is subject to some form of heightened scrutiny review. In some cases, if a statute forecloses that activity because a transaction for something of value is involved, then that statute may run afoul of constitutional protections that have been announced by our U.S. Supreme Court in Borenstein, Texas, and then in Obergefell v. Hodges. Those cases speak very broadly to a constitutional right to privacy in sexual matters. Same-sex marriage. Obergefell did involve same-sex marriage. However, Borenstein, Texas, did not. Borenstein, Texas, spoke in very broad terms of a right for all people, all American citizens who are adults and acting privately and consensually, to engage in sexual relations without fear of criminal liability. But excluded prostitution. It did not exclude prostitution, Your Honor. I do understand that virtually every case cited by the State in its brief holds that way. However, each and every one of those cases, and they're all essentially trial court cases from around the country, Hawaii, Florida, Louisiana, all of those cases were decided before Obergefell. They all rely on a line of dicta from Lawrence found on page 578 of the decision that says that the case, quote, does not involve public conduct or prostitution. It does not involve whether the government must give a formal recognition of any relationship that homosexual persons seek to end. From 2003 until 2015, when the Obergefell decision was released, that line of dicta was interpreted as meaning that the Lawrence decision excludes from its protection those activities that I just read off. How did Obergefell take that exclusion out? Because one of those activities, in fact, the very next activity mentioned after prostitution, the requirement that states give formal recognition to relationships that homosexual people may seek to enter, was given the force of law, not excluded by Lawrence, but because of Lawrence. So it's now impossible to read that list of activities on page 578 as a list of activities that are categorically excluded from the protection. But those activities are all separate. They're all separated by commas or some sort of quotation mark or punctuation that requires us to read this, this, this, and this until we get to the period. So how can you say the entire list now is suspect? Well, the list begins, it does not involve. And then it lifts off all of the activities. Thus, all of the activities are literally, as the Court says, activities that that particular decision does not involve. And that is, in fact, a true statement. There are activities that are excluded from the protections announced by the Lawrence Court. They are found and discussed at length beginning on page 569, 569 of the U.S. Corporate. Those activities include things that implicate a disparity in status between the parties. For example, a teacher-student relationship, a prison-guard relationship, things of that nature, adult incest. It excludes things that involve minors and all those kinds of conduct. Those are all described as being worthy of condemnation because they're discussed at length on page 569, not because they're mentioned on 578. And the Obergell case is ultimate proof of that because, again, one of those activities, the case Lawrence does not involve, was given the force of law based on Lawrence. That's because, I don't, I mean, Lawrence talked about anal sex, and then Obergell is same-sex marriage, which talks about which would bring us to the same thing. Where in Obergell does it talk about excluding the Lawrence reference to specifically excluding prostitution? I mean, how do you, I don't, I'm not getting how you come to that conclusion. Well, the Lawrence case just says, this case does not involve, and it lists the following things. It does not involve gay marriage. It does not involve prostitution. But we can't take that to mean it can't, it can't apply to those things because it literally does apply to those things. And the Court said so in the subsequent Obergell decision. The language on page 578 is merely descriptive. It's not descriptive. It's saying that this is what the Court is talking about right here. And I think of key importance in that is understanding that this was a decision that was written by Justice Kennedy. Around the same time that Lawrence came out, there was another landmark civil rights decision, District of Columbia v. Heller. Justice Kennedy was in the majority on Lawrence. He was in the majority on Heller. And in Heller, when they sought to exclude certain activities from the newly announced constitutional protections in that case, they did so in some very careful language. The Court said in Heller, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill or laws forbidding the carrying of firearms in sensitive places. And it goes on, and it lists what it identifies as, quote, presumptively lawful regulatory measures. I think the Supreme Court understands that when it announces a new constitutional right, or at least clarifies that one exists in the Heller case, that the right to possess arms is an individual right, not a right reserved to a collective militia. When the Supreme Court wrote that decision, it knew that the impact of that would be that it would impact firearms statutes across the country, including in our own state. So it was very careful to say what kinds of activities are not going to be part of the protections announced by the Heller case. No such language appears in Lawrence. Justice Scalia himself says it in his dissent. He says that there is nothing in this decision that excludes, and he states specifically, nothing in this decision, nothing in the majority's language excludes prostitution from the protections being announced by the Court. He also said that nothing excludes gay marriage from the protections that are announced by the Court, and he was, of course, found to be correct in 2015 when Obergefell came out. Are we supposed to give the strict scrutiny analysis? I have to be completely candid about that. There is a lot of controversy about what level of scrutiny applies in all kinds of constitutional cases, not just sexual privacy cases. And we cite a number of law review articles that lament the fact that we don't have a lot of clear guidance as to what level of scrutiny the Court has been using in its recent constitutional jurisprudence. Sexual privacy cases are among those. With respect to the Heller case I just mentioned, Heller didn't mention any fundamental right. It was later clarified by the subsequent McDonald v. City of Chicago decision, and our Illinois Supreme Court now recognizes that right to be a fundamental one. But for whatever reason— Scalia noted in Lawrence that the Court adopted rational basis. Well, Scalia says that the Court has applied a heretofore unheard-of form of rational basis review, and he says that in his dissent. For what it's worth, the only dissent that has been given the force of law in any of these cases relevant to this subject matter is Justice Stevens' dissent in Bowers v. Hardwick, which the Lawrence Court said should have controlled in Bowers and should control here, and thus it did.  But Justice Scalia's dissents, although they are very important, I think, in understanding the context that these decisions arise, do not have the force of law. But in any event, yes, Your Honor— So what should we apply? What is your argument? Well, every commentator that has looked at this and every single appellate court in the country that has given this more than a sentence or a paragraph's worth of analysis has concluded that some form of heightened scrutiny review is appropriate here. Whether that's fundamental review, strict scrutiny, or intermediate review is a little unclear. But in every case, again, where a court has given it a fair look, and this is also what the trial court below found, some form of heightened scrutiny is appropriate. If we were to apply rational basis, would you agree that there is a legitimate government interest in the difference between regulated commercial sex as opposed to non-commercial sex? In some cases, yes, Your Honor. If that conduct, that commercial conduct, involves human trafficking or pimping or minors or conduct in public places or any act of coercion, there is certainly a legitimate basis for the State to regulate that activity. However, each and every— Some of the bases that have been proposed by the case law would apply across the board, whether it's the list you just mentioned or just when commercial sex is taking place in private. If that's the case— Such as violence that this begets and things of that nature. Well, all of those sorts of concerns, again, are addressed by other provisions of the Illinois Criminal Code. With respect to the general appeal that the State makes and always makes in these kinds of cases, the health and welfare types of concerns, those, as I already— They probably make them because they usually are successful. They usually are on rational basis review. However, for a constitutional right, and I can't think of another constitutional right that is subject to mere rational basis review, one that has been identified in this context. I don't think that kind of a right exists. But for those kinds of cases, as our Illinois Supreme Court said most recently in the People v. Cherez case, are not nearly close enough for the State to meet its burden in justifying statute when some kind of a constitutional right, whether it's strict scrutiny review or some form of intermediate scrutiny review, is at play. In Cherez, the Illinois Supreme Court took a look at a section of our Criminal Code that prohibited the carrying of a firearm within 1,000 feet of a public park. And the Illinois Supreme Court found that to be an unconstitutional violation of the Second Amendment. The State pointed out quite correctly that it has a very compelling, let's say, interest in preventing the use of firearms in public parks. In 100 percent of the cases where a gang member goes into a public park and shoots someone, he will have come within 1,000 feet of that public park with a firearm. There's no question about that. However, there's too much innocent conduct that gets subsumed in that kind of a statute. It prevents people from walking within 1,000 feet of a public park with a firearm who have no ill-intent in mind, who are no threat to society. The same, I think, is true with a broad prohibition on sex that just happens to involve the exchange of something of value, whether it's money, tickets to a concert, a dinner, anything like that. All of those things can be considered the exchange of something of value. That kind of prohibition is a blanket prohibition just like the one that the Supreme Court, our Supreme Court, condemned in Therese. It eats up too much innocent conduct. The only possible justification for prohibiting outright the transactional component of a sexual relationship is a moral one. And as Justice Scalia recognizes and as other commentators have recognized, that is not a sufficient basis for curtailing a right that has been described as constitutional or fundamental. In the case of Loving Me Virginia, a controlling majority of the Virginia state legislature found that it was immoral for a black person to marry a white person, and thus that kind of conduct was outlawed in the state. A majority of the people in Virginia, at least in 1971, felt that way. That was of no moment to the Supreme Court. Marriage is a fundamental right, and a statute that impinges on that is going to have to meet a very high standard of review. And a statute that said a black person can't marry a white person is simply a moral prohibition to the court. This goes to what you're just talking about. There is a relationship between the two people who want to marry in the Virginia case. There is a relationship between the two people in Lawrence who were having sex in their home. And certainly Oberfeld talks about a relationship that is ongoing between two people of same sex that they want to make permanent as in a marriage. Most, at least the cases we've seen, most of the situations like we see here are certainly not a relationship. They are a one-time activity or maybe once or twice, depending upon the circumstances. So how do we put these relationships in a line and make them the same? Well, I think that's a large part of Lawrence here, Your Honor. The only antecedent facts the Supreme Court found worthy of reciting in Lawrence were that the petitioners were adults, they were acting privately, and they were acting consensually. There was no suggestion in Lawrence that Tyrone Garner and John Geddes Lawrence were in a relationship. That would have been impossible because they were not in a relationship. My understanding is they had met that afternoon, and in Mr. Garner's obituary, which is part of the record, it's disclosed that they were at best occasional sex partners. There was no relationship there. Nor does the Supreme Court talk about that as an antecedent fact necessary for those protections to apply. Practically speaking, I think that would be an impossible application of the law to try to determine whether a relationship was sufficiently serious or intimate or ongoing. Your Honor, it looks like I've used up my time. I think you should not. Or ongoing before we give it constitutional protection. And I think that is actually found in over the up. If I just may quote that section. The Lawrence court invalidated the Texas law, which forbade same-sex intimacy. The Texas law, just to be very clear, did not outlaw holding hands or kissing or hugging or writing love letters. It outlawed same-sex anal intercourse. And I blush a little bit to say that in this kind of setting, but I think that's why the Supreme Court uses words like intimacy rather euphemistically in those settings. But I don't think it suggests, or if there's any basis to think that it suggests, that the protections announced in Lawrence only apply to people in committed relationships. Are you making only an as-applied challenge, or are you also making a facial challenge to this law? This is only an as-applied challenge, Your Honor. All right. Counsel, you'll have an opportunity to respond if you wish after counsel presents her argument. Thank you, Your Honor. Ms. Hoffman. Good afternoon, Your Honors. May it please the Court, counsel, Lisa Hoffman, Assistant State's Attorney representing the people. Your Honors, the defense argument is that, as I see it, involving mores leads us to a place where this Court should determine that it's time for the prohibition against prostitution to fall. And she bases that on Lawrence and then overthrowing that sort of progression, as she would see it. I think that, and I'm going to, I think that Lawrence bears little, bears little on this case, as most of the post-Lawrence case laws found. Lawrence is about your sexual privacy rights. Lawrence is about sex acts. It's not about sex as a business. And I think that that is, that's the answer. And that's the key to why there is nothing that is, that makes it incumbent upon this Court to veer from what is the precedent. You know, we have only one decision in this State, and that's Williams, well, one post-Lawrence decision, which is Williams. And we have, you know, numerous decisions throughout the country. None of, no Court has said, oh, yes, prostitution, prostitution statutes, prohibitions must fall. We don't have any post-Oberfeld cases. No, we don't. I don't think Oberfeld speaks to prostitution at all. It provides no, it doesn't provide any suggestion that because it decided that gay marriage was all right and, you know, couldn't be prohibited, that somehow that speaks to prostitution. And I will, I guess I'll go back to the conversation you had with counsel about that language in Lawrence that says this statute doesn't, this case doesn't address prostitution. I do think that what Justice Kennedy was suggesting was that the Supreme Court would have to take up those situations, prostitution, gay marriage, in another, they would have to take those up separately because Lawrence wasn't designed to deal with those things. And they did do that with gay marriage in Oberfeld. They took that up and they made a decision. And maybe one day they will take up the issue of prostitution and they will make a different decision. But as we stand here now, I think that the defendant's arguments are better made to the legislature. If, in fact, our moral compass is changing and, or perhaps it's been off balance and now we're coming to the right, then that's an argument to be made to the legislature and the legislature can change the law. Well, you know, we have a definition of prostitution in the statutory authority that, in fact, is very similar to most traditional dictionaries. And so it clearly talks about, performs, offers, or agrees to perform any act for anything of value. I mean, we would have to not only change the moral compass, we would have to change the concept of what prostitution was or what prostitution could be because aren't there times in which it could be dangerous, such that it should be regulated? Well, of course. I think that's why the courts have universally found that the statutes meet the rational, you know, pass that level of scrutiny that they have. That, in fact, you know, these statutes are addressing, and they are rationally related to many different important governmental interests. I mean, in this case, it's, you know, the Illinois cases, Williams used the, I guess their phrase was safety, health, and the welfare of the people. I think that was actually. Williams rejected strict scrutiny, didn't he? They did, and on a rational basis. And I think counsel is candid in saying that strict scrutiny has really, no one's ever really said that was the right analysis. But if it is a fundamental right, wouldn't that be the right analysis? I mean, counsel's quoting the language from the cases that talk about fundamental constitutional rights include privacy with regard to the most infinite aspects of one's life, and that certainly would apply to something of this nature. Well, you know, I guess I'm going to disagree just slightly, which is that there's nothing about this statute that's in question here that impinges upon Ms. Conroy's right to engage in any sexual act that she wants as a consenting adult, as long as, but that's not what she's asking for. She's asking for the ability to conduct a business. Commercial sales. And so, you know, she puts an ad on the Internet and, you know, those things. So it no longer is, I mean, while in fact I think the majority of people would agree that sexual acts are quite intimate, but in this instance, this is a business. Whether it involves an intimate act or any other act, in this instance it's a business. And so it's not impinging, no one is impinging upon her right to engage in sex acts. But it's saying, what we say is you can't do, you can't have a business doing that in this state. How about the public policy arguments that she makes? Well, again, I think the public policy arguments are wonderfully directed to the legislature. The legislature may well decide that it is time in Illinois that we have a different view and that, you know, we can have this as a business and regulate it in a way that makes things maybe, you know, there are arguments on both sides that sort of cancel. The argument on the side of why do we not want prostitution is health and public health and safety. The argument on the other side is, well, if we had it as a legal business, we could regulate it, we could, you know, make sure that people are treated better. But in the end, neither one of those, you know, one doesn't make the other unconstitutional. Marijuana, gambling, prostitution. Okay. Again, perhaps the legislature will, you know, would look favorably on the argument. But the fact that that is an argument, perhaps the evolution of our worries is leading to that decision by legislatures does not mean that it's a valid argument for this court to diverge from precedent when it's been given no signal by the higher courts that that's the answer. Again, I think we go back to the idea that in Lawrence, when they spoke to this, they were speaking to a statute that did not involve commercial behavior. In fact, I do, I, in Thomas' very short dissent in Lawrence, he, Justice Thomas' dissent, he describes the statute in question and he actually says that he thinks it's a silly statute. But he says, punishing someone for expressing his sexual preference through noncommercial consensual conduct with another adult. I mean, there's every, the acknowledgement is that the statute at issue in Lawrence was not about commercial sex. It was about private sex. And so, again, we're not, we're not at a point where we've got some directive that we, that these statutes should be held unconstitutional. As it relates to private sex and the counsel that distinguishes Williams from this case based upon the public nature of the solicitation, do you see that as distinguishing? No, I do not. I think that the, what takes it out of a, again, what takes it out of simply being a sexual privacy issue is that it is being done as a business. Again, it was kind of like advertised on the internet. And so, you know, she put out to the public that this was, you know, and so, again, she can engage in whatever sexual activity she likes. But she can't do that as a business. Does it take it out of being private when you put it out there on the internet? Yes. I mean, I think it's not the same. I mean, obviously, when you engage in, I mean, no one's suggesting that you have to engage in the act. I mean, you couldn't suggest you have to engage in the act of prostitution in some public place in order for it not, you know. But the fact is that the sexual privacy right that Lawrence was looking at is not the same as the, when you then make it your business. So the pay, the commercial is what you think is driving it. Yes, the commercial is what's driving it, of course. So it wouldn't be the same as Tinder, where you're basically putting out there. Right. I mean, right. Or something like. Right, exactly. One of those websites. Right. You know, to consent an adult engaging in activity without the exchange of money, that's not a problem. However, you might find that person. And however long you might know that person. And how, you know, any of those things. But. Well, we don't have the situation here, but the statute does say anything of value. You've used Tinder, you've found each other, and now I'm going to buy you a drink or you're going to buy me a drink. Does this create an issue of prostitution? I do not think so. And I guess that the question is, well, that we'd be going. I guess that's why they say it's the oldest profession. Well, I mean. Women have been getting drinks and meals for a long time. Legitimately, there might, I'm not going to say I can't think of situations, or I couldn't think of situations if I thought about it. Where maybe, you know, currency, does it have to be that? But I certainly think that any time someone says, you know, offers to have dinner, and then, you know, if we have dinner, can we? I mean, that probably happens in marriages and all sorts of situations. I don't think that's. We're talking now about someone who's doing this as a business. If there are no other questions. No, I have none. Thank you. Thank you. Mr. Goldie. Your Honors, Ms. Hoffman indicated that we had no signal from the higher courts with respect to this issue. We, of course, acknowledge and concede that. This is a case of first impression with respect to several different issues, and that's just the nature of that game. Someone has to go first. How is it a case of first impression? The Illinois Supreme Court has never ruled on the constitutionality of 11-14A. The second district has never made that ruling. The only court to have made a ruling, the only appellate court to have made a ruling on it is the third district, which did so. How about the first? No? The first district has not talked about it before a reference in the case of Peter B. Johnson. That was a 1978 case. It was back on remand from the Illinois Supreme Court a couple of years earlier. And in Peter B. Johnson, the defendant in that case solicited an undercover officer in the 1300 block of North Clark Street. Yeah. So how is that different? Well, they raised the privacy issue in that case. That's the intersection between North and Clark, one of the busiest intersections in the city of Chicago in the Midwest. And the Illinois appellate court, the first district, said in no way is this private conduct, so we're not going to countenance your sexual privacy argument. But in that case, they talked about the state's legitimate interest in outlawing prostitution, did they not? And in that case, without a fundamental right of issue, without Lawrence, which was still 25 years away, yeah, they were going to be correct on that argument. I think that Peter B. Johnson was correct when it was decided. However, since Lawrence came out and for the first time announced that fundamental right, the only Illinois appellate court to have taken a look at it is the third district. They, of course, did so before Obergefell permanently foreclosed the rationale they used for excluding Lawrence from their analysis. So every court that's looked at Lawrence in this context nationwide has found no fundamental right to commercial sex, correct? Well, every court that's looked at this in the wake of Lawrence did so immediately after Lawrence, 2004, 2005. I believe, and I've scoured Lexis for this, but I think we are the only people to make that argument in the context of that text on page 578 and the effect of Obergefell. We also make an argument in the briefs, and we made this before the trial court, that the only other reference to prostitution in the Lawrence opinion is a reference to what's called the Wolfenden Report, the report on the Committee of Homosexual Offenses and Prostitution. The Lawrence court plucked that publication out of obscurity from England from the 1950s to show that the Bowers court failed to take into consideration authority appointed in the other way from its now discredited conclusion. At the time the Bowers court made that decision, 1986, there were literally countless other publications that pointed in that direction. Some of them were household names, Masters and Johnson, Kinsey, and so forth. The fact that they picked that one, which forcefully condemned anti-gay laws and anti-prostitution laws, I don't think can be taken as insignificant or coincidental, and I don't think anyone else has made that argument. So we're making it. Why is this not a matter to address to the legislature? And where it has become legal in limited places, isn't that how it happened? The only place where it's legal in the United States right now is in Nevada. The nature of fundamental rights, though, is that we need not wait for a legislature to act. The couple in Lovington, Virginia didn't have to wait around until the people of Virginia, or at least their elected representatives, thought that it was fine for blacks and whites to be married. They went into court and they demanded their rights, and that is what my client is doing today. Through, I think, no small emotional burden, not to mention a financial one on top of that, I do think this is a very good appeal to advance the state of civil rights and fundamental rights in this state. And I do think that's worth acknowledging in this context because it is in that tradition that all of our fundamental rights have essentially been advanced. They rarely come from the legislature. More often than not, it's an appeal to the judiciary where we vindicate those kinds of rights. It's a great tradition. Your fifth argument does ask us to consider public policy as it relates to this issue. And in that regard, isn't that better directed to the legislature? Well, we acknowledge that there have been a couple of legislatures, New York being one and I believe the District of Columbia being another, that have taken these issues up. But even the most ardent proponents on that side say don't hold your breath. The legislator is looking at it. But it may take a while. And, again, that's the teaching that we have in Obergefell. That's the teaching that we have in many of our constitutional cases, that when a fundamental right is at issue, you need not wait for the legislature to act. If I may, I'd just finish that thought on that note. With respect to is it time, we're not asking to invalidate 99% of the laws in our criminal code that impact prostitution. Just a very broad prohibition in this as-applied challenge. And in that context, as to whether it's time or not, I will say that in these very divisive political and social times, I can't think of another issue that both the ACLU and the National Review are on exactly the same page on. Very respected mainstream publications on the left and on the right have all said it's time to end this. The National Review article was just one commentator's opinion. It is one commentator's opinion. I don't know that that's the opinion of the editorial board of the National Review. I don't know that it is either. I don't know what Mr. Buckley's personal beliefs on that subject are, though I think I have some suspicions on that. But I think the larger context there is that the National Review did run that article, and they could have chose not to, just like the New Republic did and the ACLU, Human Rights Watch, Amnesty International. Basically, every major mainstream human rights organization in the United States has come out in favor of ending these kinds of prohibitions. Is the legislature an option for that? Yes. Judiciary is as well, and in our tradition of how we vindicate fundamental rights, how we've always vindicated fundamental rights in this country, it's been through the judiciary. Heller didn't wait for people to say, oh, yeah, you do have the Second Amendment right, and we'll vote on it, and it'll become law that way. He went to court, and so did the Lovings. So did Mr. Garner and Mr. Lawrence, and just as they did, so is Ms. Conway today. If Your Honor have any other questions, I'll be happy to address them. If there's any supplementary briefing that's required on these issues, happy to provide it. Otherwise, I thank you all very much for your time, and we appreciate your consideration of these novel and difficult issues. Thank you, both counsel, for your arguments today. I think we're – I know we're not going to look for supplemental briefing at this time, but we will take the matter under advisement, and we will enter a decision in due course. Thank you. Thank you, Your Honor.